The next case on for argument is Hoit v. Capital District Transportation et al. Podium will come down a little bit, Ms. Dyson, if you would like it. There's a button over to your right. Thank you, Your Honor. Good morning. Good morning, Your Honors. May it please the Court. My name is Maria Dyson, and it's a pleasure to represent the plaintiff in this action, Kevin Hoit, who sits in the gallery behind me. Your Honors, this case is not just about the abhorrent sexual assault to which Mr. Hoit was subjected to at his place of employment. It's about the important issues about how sexual assault is viewed by society and, more importantly, by the Court below. On November 7, 2013, Mr. Hoit was working his last day as a mechanic at the Capital District Transportation Authority, or CDTA, which is the equivalent of MTA in New York City. He was grabbed behind from his coworker, Tony Clanton, tackled to the floor, had his arms pinned behind his back, and was dry-humped by Tony Clanton. At the same time, his supervisor, Defendant Baez, joined the scene, dropped his pants, and started rubbing his testicles on the back of his head. At the same time, his coworkers and Defendant Frank Mancini, who was also a supervisor at CDTA, circled the incident and started taking pictures and video recording the incident. People were laughing at him, and later on, these photographs were distributed on the Internet and on Facebook and sent to Mr. Hoit personally. So one of the challenges you face, of course, is the paucity of law with respect to what makes a state actor in an employment situation. You have here supervisors and coworkers in a state facility, or a municipal facility, all acting together. And it's the plaintiff's theory, as I understand it, as part of a ritual or a ritualistic behavior. Am I right? Yes, Your Honor. And it's your theory that this joinder of supervisors and coworkers in an open and notorious way in a state facility or a municipal facility, a government facility, let me say, creates state action when there's discriminatory intent involved? Your Honor, I want to make sure I understand the question. Are you asking about the plaintiff's claims against CDTA and how we're holding CDTA liable? Well, I think you have to show that the individual defendant, and here particularly, Clanton, was a state actor. Correct. Yes, Your Honor, and the reason why Defendant Clanton can be held liable, and similarly, Defendant Frank Mancini, is you have all of the traditional effects that are associated with whether someone is acting under color of state law. You have them acting on the CDTA's premises, they're in uniform, on duty, and then you have the additional fact that the acts that are being committed are part of the ritual, that they're being cloaked in state authority. This was an act that was done routinely to employees on their last day of work. It was also part of a larger pattern of practice that was tolerated by CDTA. Now, just on that last point, and then we'll yield back to Judge Cote, but on that, what is the evidence that it's routine, if you will, or that it has occurred repeatedly such that CDTA should have been aware of it? There's two points, Your Honor. First, Defendant Clanton testified that there was a ritual that was engaged in by both himself and his supervisors as well, including Defendant Bias. He admitted that in his testimony. Did he say he had engaged in it or he had seen it engaged in on other occasions? Did he have firsthand knowledge? Yes, Your Honor, and he had indicated both himself and other employees had engaged in this ritual. Now, he maintains that the ritual was only roughhousing or teasing, but you have evidence both what happened to my client and there was testimony from several employees about the nature of this ritual, that this ritual included sexual harassment-type behaviors, including teabagging and dry-humping other employees. So one of the arguments made by your adversary is that there is no firsthand evidence of that practice, that it is all rumor. So do you have – are you telling us that Clanton – we can find in the record that he has firsthand knowledge of what you've described? Your Honor, one, it's my understanding that Mr. Clanton testified that he engaged in this ritual. He categorized it as roughhousing, but there has been testimony to the contrary. There were employees, including Employee Raven Take-Chen, who indicated that he personally saw Mr. Bias teabagging and dry-humping other employees. And beyond direct evidence, just because something is hearsay or rumor, that can still be admitted at trial, and it's the plaintiff's position. Probably not. Okay. So – but firsthand knowledge, either by seeing it or participating in it, would be admissible, I agree. Thank you. And I would respectfully disagree with Your Honor. Just because something is hearsay doesn't mean it can't be admitted at trial, and I believe that the district court below did not engage in any analysis as to whether the plethora of incidents that were described by various employees, including Raven Take-Chen, who did testify that he heard this himself, that was that employers or supervisors were talking about sexual acts that they had engaged in with their partners. They were talking – or they were watching pornography. But regardless, some of the rumors and hearsay, just because it's hearsay, it can be admitted for other purposes. And if the district court is going to dismiss the plaintiff's claim and take him from the courthouse, take his ability to seek justice for himself, there should have been an analysis about these incidents and whether or not they could have been admitted for other purposes. It could have been admitted for purposes of notice, which is an element of a sexual harassment claim and a claim under New York State human rights law. And I think that's what we're going to find in the record here on appeal that you've submitted to us, record citations to this firsthand evidence that is participation by the witnesses you wanted to call a trial or, you know, overhearing conversations discussing it by others who participated in it. Yes, Your Honor, you'll see a lot of evidence from an employee named Raven Teichan, who testified that he was shown pornography by defendant Clanton and defendant Baez. You'll hear evidence that he had himself witnessed defendant Baez. I believe – I'm not sure if it was dry humping or teabagging, but it was certainly one of those incidents that he saw firsthand. He had testified that this conduct was so pervasive that you either go along with it or you put yourself in a position where it didn't happen to you just to try to escape it. And so, yes, Your Honor, you will hear both direct accounts of things that employees witnessed, in addition to testimony from employees who said that they heard things or that there were rumors that things were going on. You'll also see that defendant Baez has been previously disciplined for conduct that he engaged in in the workplace. So there's certainly accounts that are independently verifiable in addition to the various hearsay allegations that the plaintiff provided. Now, I don't want to discount the inappropriateness of watching pornography in the workplace, but I just want you to put that aside and understand that my question is not asking about individuals who are disciplined for watching pornography in the workplace. Yes, Your Honor. So in addition to that point, Raven Teichand did say that he witnessed Mr. Baez. I'm not sure if it was dry hump or teabagging another employee, and that was something that he personally witnessed. Going to what is the most objectionable part of the opinion below, the Court held that the conduct to which Mr. Hoyt was subjected to did not alter the terms and conditions of his employment. And in reaching that decision, there was two points that the Court made. The first was that because it was his last day of work, that this couldn't have altered the terms and conditions of his employment, which it just runs directly contrary to precedent from this Court. In Whidbey v. Garzarelli, the Court addressed a discrimination and harassment claim from plaintiffs who were working at McDonald's. And in considering some of the conduct, the Court held that just because there was discrimination occurring on the lawsuit, it did not alter the terms and conditions of his employment. And in reaching that decision, there was two points that the Court made. The first was that because it was his last day of work, they could still consider that, that just because you're working your last day of work doesn't mean it's open season for employees to be harassed and discriminated against. And I would submit that that part of the district court's decision below runs contrary to this Court's precedent on that point. The second point that the Court made was that he didn't believe that the plaintiff was severely affected enough by what happened. And that the plaintiff's testimony, both from himself and from his coworkers, about how upset he was about what happened, and Mr. Hoyt had sought psychological counseling and was on taking anxiety medication for several years. The Court deciding that having genitals rubbed on the back of your head and being dry-humped wasn't severe enough to alter his conditions of his employment, which is a sexual assault which, by that fact, alters the conditions of its employment. And the third medication for several years. And Plaintiff is contending in this case that CDTA knew or should have been aware of a sexually explicit environment that permeated the workplace. So, turning to the state actor issue, if there is sufficient evidence in the record to show that there was a ritual for the last day of employment in a state office or a government office, in which superintendents and supervisors and coworkers sexually or physically assaulted a coworker on their last day of employment in a way that a jury could find was with intent to discriminate against them because of their sex, is it your contention that cannot be state action? Well, Your Honor, I understood when you were asking the appellant this question that that was directed to the actions of Mr. Mancini and Mr. Clinton, and I don't represent those individuals, so I defer to counsel for Mr. Mancini and Mr. Clinton on that one. But I'd like your position, too. My position is, to the extent that there can be any liability on behalf of CDTA, there had to have been a policy and procedure that was so ingrained at the garage that it became a force of law. And in this particular case, looking at the facts, Your Honor asked, what is the direct evidence that this had happened before? We're not contending that there wasn't testimony that there was a ritual of roughhousing on an individual's last day. What we are contending is that this ritual did not include sexual assault. Appellant is pointing to... So what kind of roughhousing constituted that ritual? The only testimony in this action is that they would roughhouse, pull pranks on each other. That's about it. The single... No, roughhousing to me suggests physical contact. Is that what you're talking about? I believe that was suggested in the record, but I do not believe it was of a sexual nature. I believe that was suggested by Mr. Baez, and Mr. Taichan testifies that he saw this. In looking at the record, Mr. Taichan says he saw this occur to Mr. Hermance. Mr. Hermance gave testimony in this matter. Mr. Hermance said he had never experienced any issues at the CDTA garage. This is the individual that they're claiming was teabagged by Mr. Baez. But that's a disputed issue of fact, then. But this is why it's so important for the court to have parsed through what was hearsay, what was rumor, what they heard. Mr. Taichan says that this occurred. The witness himself says it did not occur. The victim, you mean? The person who would have been the victim had it occurred. Yeah, the person that would have been had it happened. They say there's no indication that they testified that that occurred. Under those circumstances, is the district court or the trial court, which is analyzing the state of the evidence to see if they're disputed issues of fact, is the trial judge able to actually discount and say, well, that doesn't count because it's impossible? I mean, I'm assuming this is deposition. Well, it was deposition testimony, right? It was deposition testimony, yes. The court didn't actually analyze that particular issue, because I don't think it was ever specifically raised by the appellant. But I looked through the record, and I tried to find, because I anticipated that would be the question, had this ever occurred before. And I can tell you, even if we take what Mr. Taichan says, he's saying that Mr. Baez had done that before. He does not say it was ever part of a ritual, that it was ever part of a ritual. It was never ever part of this horseplay that had gone on. Mr. Baez had nothing to do with this group of friends that would do this at the end of a person's employment. One thing I'd like to address as well is, plaintiff comes into this court and tells you that sexual conduct permeated CDTA. Mr. Hoyt logged in roughly 1,500 days at this garage, 12,000 hours in the garage, and he claims it was akin to animal house. He didn't observe a single instance of misconduct that he now claims was so prevalent. He had never been subjected to any type of harassment before. He had never witnessed any behavior he claims permeated the workplace. Anything that he felt was inappropriate. In fact, he was friends with Mr. Clayton, he was friendly with Mr. Mancini, and he had no issues with Mr. Baez. I'd submit to you that it defies logic, that a workplace is so permeated with sexual misconduct that a full-time employee working there for six years never once observed it himself. And I give him credit for acknowledging that, but that's the fact here. And to then allege that there was a policy and procedure at CDTA that had the force of law is belied by these facts. In terms of hearsay and whether the court can, should have not parsed through the testimony here, I'd point out to the court that the district court was correct in parsing through the facts. Because many of Plaintiff's claims that are made in this case were just not substantiated by the record. The complaint specifically states that Clayton and Baez had assaulted other employees by tackling them and pretending to rape them. That is nowhere in the record. That Baez and Clayton had teabagged another CDTA employee in front of high-ranking officials, that is nowhere in the record. The court was not making credibility determinations. They were appropriately considering what was admissible evidence and what could be considered in support of the motion. In fact, I would submit to you that there was no basis for this hearsay evidence to come in. Plaintiff noted two ways that hearsay evidence could possibly come in in this case. The effect on Plaintiff's perception and notice. Here, we know that Plaintiff never perceived this before, so that can't possibly be an avenue to get the hearsay evidence in. And finally, notice, there's no indication that any of these specific acts were advised to CDTA. And on that point, I think it's one of the most important points here, the record is undisputed that every time a sexually inappropriate report of misconduct was reported to CDTA, action was taken, it was investigated, people were terminated, that's exactly what happened in this case. And it's because there was no policy or procedure of condoning sexual harassment in the workplace. Thank you, Ms. Myers. Thank you. Ms. Jocelyn. Good morning. May it please the Court, Lisa Jocelyn on behalf of Defendant Appellees Tony Clanton and Frank Mancini. I want to start off by saying that no one here is trying to defend the inappropriate actions of Baez. He's not even here to defend himself. So we all agree that that act was inappropriate. And he was discharged. And he was fired for it. So the plaintiff uses the word justice, and they have been throughout this entire proceeding. And it is my position, and I believe I share this with co-counsel, is that he obtained justice appropriately from the one individual who was responsible for the heinous act. Now, they are also sitting on a judgment against that individual that they have to collect. So it is our position that their attempts to now come after CDTA and my clients is separate and apart from that. There is no justice to be had here against the individuals Tony Clanton and Frank Mancini. So let me ask the question that I've asked the others who've made argument here today. What is your position as to whether or not, for instance, Mr. Clanton or Mr. Mancini are state actors, if they participated in ritualistic sexual abuse while in uniform, at their workplace in an open and notorious fashion, victimizing the plaintiff? Are they state actors or not? If all of those parameters are met, there is absolutely an argument that they would be state actors. The problem for the plaintiff is that those have not been met. None of those elements have been met. The only thing the plaintiff hangs their hat on is that they were in uniform on the job site. And that's it. They were not acting under color of state law. Mancini, although a supervisor, was not a supervisor of the plaintiff or Baez. The people involved in the act. Sorry. I thought you just admitted that they would be state actors. That is acting under color of state law. If the evidence were there, as I've described it, if it was a sexual assault. So bias may have been a state actor. That's not the issue for today, because they have a judgment against bias. Mancini and Clanton, in this case, are not state actors. Well, let's just take Mr. Clanton. Clanton, one could say, I know there are disputes, but he began the attack on the plaintiff and wrestled him to the ground and dry humped him. Now, I know these are disputed issues of fact, but that is one version of the facts that have been presented to the court below. That's correct. So if one could find him acting with Mr. Baez as part of this ritualistic last day attack on the plaintiff, would he be a state actor in acting under color of state law? Your Honor, I would suggest that they still would not be state actors, because it would be a personal pursuit as opposed to a pursuit in the context or inside the scope of employment for CDTA, which is required. It's an element under Section 1983. In any event, as I mentioned earlier, we don't have those elements. There was no ritual of a sexual assault. There was no intentional conduct based on the plaintiff's sex, which is critical here. The plaintiff doesn't address that piece, but it is critical. You think this could have happened to a woman? It could have happened to anybody. You think that the individuals photographing it and the person doing your client, Mr. Clanton, doing the tackling, the others circling and photographing, the dry humping, the tea-begging, would have happened to a woman? I don't know whether it would have or not, Your Honor. I don't. And we don't know whether this would have happened to a woman, because this has never happened before in the workplace, as far as I know, and as far as the record reflects. Mr. Taichand, who Plaintiff's counsel has referenced on several occasions, was the first and only person to suddenly come out with testimony that this has been a pervasive pattern. We didn't hear that from the plaintiff, which is ironic. The plaintiff didn't say that in his deposition. The plaintiff, as my co-counsel alluded to and stated succinctly, is that there was no pattern in practice. There's no evidence of it. Mr. Taichand, we don't understand his motives, Your Honor, and I wouldn't perceive – I wouldn't even try to guess. But he's the one who took a picture, and we believe he may be the one who shared the picture, and it was the plaintiff's stepfather who posted this picture that has caused so much trauma to the plaintiff. So there are a lot of problems here with the facts, and I think the lower court understood this. There may be a dispute of some of the issues, but even given the facts that are tangentially supported by the record, it's not enough to meet any of the elements of a Section 1983 claim or any of the elements of a human rights law claim. Now, the tort claims that you mentioned, they're definitely a possibility, and as Plaintiff's counsel stated, they would be a little bit easier under these circumstances. But the court did not approve an assault or a battery. They missed the statute of limitations on those claims. And there's nothing we can do about this. I think that the Court was absolutely correct in that. You mentioned – With respect to negligent infliction of emotional distress, the nonintentional tort. I don't – did they bring a negligent infliction? Yes. Yes, they did. Okay. I apologize. In my mind, I have only an intentional infliction of emotional distress. That would be a three-year limitations period, Your Honor. Yes. I agree with that. But that, too, assuming Judge Cote and I are right in our view of the record, was in my – I think swept up in the order dismissing those claims with prejudice. Yes. The entire – the entire complaint was dismissed. Should we remand that single portion, if indeed that is there, because on the basis that it wasn't covered – sorry, it wasn't barred by the statute of limitations applicable to it, and let that proceed at least in State court? Your Honor, I would submit that that would be futile, so you should not do that. Negligent infliction of emotional distress still requires support in the record. And I don't know who would have been negligent in this circumstance when no one knew what Baez was going to do. I mean, if you really look at the facts that are undisputed, Baez admits himself that nobody knew what he was going to do. He acted on his own. He never discussed it with anybody, and he had never done it before. Clanton testified, I was shocked. I was wrestling with him like we do with our friends, and Clanton and Hoyt were very good friends before this, very good friends, and that's undisputed. He was wrestling with his friend, joking around with him. Baez shows up, does this ridiculous act, which is horrible. I agree with that. And Clanton discovers it, lifts his head up, sees it, and jumps off. That's a very different fact pattern than the one that the plaintiff wants the Court to believe. Now, given that, there's no negligence there. As soon as Tony Clanton saw what was going on, what was really going on, he got up and he walked away. He talked to him afterward and said, I can't believe Baez did that and took it that far. The plaintiff never said anything to him about it, didn't get upset with him, didn't get angry with him, didn't do anything. The plaintiff didn't get upset about anything until his own stepfather posted it to Facebook, and then it started flying around the Internet. That's what upset the plaintiff, and we can't be held responsible for that. In the same respect, Mancini had nothing to do at all physically with this act. He is a supervisor, but was not a supervisor of the plaintiff or of Clanton. And he did not actually participate. Now, whether he was negligent in breaking it up is a very difficult – that would be a very difficult bar for the plaintiff to meet, because he didn't know what was happening until it was over. So he walked over to the event. Baez stands up, which when everyone realized he didn't have his pants fully up, and then it was over. So there's nothing – there's no way to stop it, because he didn't know it was going to happen either. So for that reason, I think that even bringing it down would be futile. I see that my time is out. May I ask, Judge, one question? Sorry. I'd like your reaction with respect to the Savings Clause issue, with respect to your two individual defendants, your clients. Yes, Your Honor. If the Savings Clause makes the notice of claim timely, what is the impact on the claims the plaintiff is bringing – the State law claims that the plaintiff is bringing against your two clients? If the Savings Clause were applicable to the individual employees, then there would be a problem for my clients, Your Honor. But we submit that it's not. It does not apply to the employees. It may or may not apply to an employer or the government entity here. But that one-year, 90-day provision does not apply to the employees. And we do mention that briefly in our brief at page 33, Your Honor. So it would only permit a lawsuit against the employer, not the two employees? Correct, Your Honor. That's our position, yes. If there's anything else, thank you. Thank you, Your Honor. Ms. Dyson, you've reserved two minutes for rebuttal. If there is one point I'd like to clarify, I would have to do further research to see if the year-and-90-day savings provision applies to individual employees. That I'm not sure about. But I would assert that it certainly applies to the Capital District Transportation Authority. I want to point out that a lot of the arguments that the appellees have made, and it was certainly something that the district court engaged in, is credibility determinations. You had not just testimony from Mr. Tachan, who – and I will point out to Judge Cote there was additional testimony about things that were directly observed, including the superintendent of the garage, Stephen Waxman, who Mr. Tachan said he observed walking around the garage, oftentimes in his underwear, tucked into his butt, and talking in an effeminate homosexual voice and making fun of employees. So there was certainly a lot more direct observation that is cited in the record in the appellant's brief. But that's what the court did here. They made credibility determinations. The court said, I don't like Mr. Tachan. I don't like Mr. Baez's testimony. Mr. Baez filed a Division of Human Rights claim, and his defense was that this was the environment in the garage. I thought that my conduct was not going to be objected to because this is what everybody was doing. This is what Superintendent Waxman was doing. That was not the court's role here. The court should have allowed a jury to decide whether or not it believed Mr. Tachan, whether it believed Mr. Baez. And going back to Your Honors' point about hearsay, the admissibility of hearsay, there's one case in particular that I would direct the Court to. There was a case that addressed the admissibility of a statement that said, you know, so-and-so is a dumb N-word. And the Court said, you know, that is a hearsay out-of-court statement, but it's certainly not being offered for the truth of the matter asserted. It's being asserted for non-hearsay purposes, including the effect on the people that heard it and for motives here. But what about testimony to the effect that I've heard rumors that this is happening or that? I would say that that's hearsay, is it not? I would agree, Your Honor. But that is the same thing. Going to not just the plaintiff's state of mind, but it goes to the state of mind of Defendant Clanton. It goes to the state of mind of Defendant Baez about why they would do something like this in the workplace. How does this happen? And it happens just like Mr. Baez said in his DHR complaint. Scalia. That's not the issue before us, is it? I mean, the issue before us, at least in some respects, is what does the employer know and when did it know it, or what should the employer have known and when should it have known it? And one of the ways to show that, Your Honor, is to show that this conduct was so pervasive that it was tolerated and condoned within the environment. And in the discrimination cases, this Court has noted that oftentimes, most of the time, the evidence that the plaintiff is going to present is circumstantial evidence. You're not going to have Mr. Waxman come in and say, yeah, I was doing this. You're not going to have Mr. Clanton come in and say he was doing this. But the Court overextended its role when it decided. For example, it adopted Mr. Clanton's version of events when he said that Mr. Waxman was saying, oh, what's going on? No witness supported his testimony. And the plaintiff pointed to various points in the record where Mr. Clanton himself pointed out a different version of events. I see that my time is up, Your Honor. Thank you. Thank you very much. Thank you, all three of you. We'll reserve decision in this case.